LINDE AIR PRODUCTS CO. v. GRAVER TANK & MFG. CO., Inc. et al.

No. 607.

United States District Court
N. D. Indiana, Hammond Division.

June 6, 1947.

Cahill, Gordon, Zachry, & Reindel, New York City, Carlson, Pitzner, Hubbard, & Wolfe, Chicago, Ill., Crumpacker, May, Carlisle, & Beamer, South Bend, Ind., for plaintiff.

L. L. Bomberger, Hammond, Ind., Mc-Keehan, Merrick, Arter & Stewart, Cleveland, Ohio, Wilkinson, Huxley, Byron & Knight, Chicago, Ill., Oberlin & Limbach, Cleveland, Ohio, for defendant.

SWYGERT, District Judge.

The first question to be decided in this case is: Did the patentees invent something patentable over the prior art of electric welding? If they did, two collateral questions arise: What constitutes their invention, and what are its boundaries?

The evidence on the first question is clear and convincing that Jones, Kennedy and Rotermund invented an important improvement in electric welding. Their method of welding differs vastly from electric-arc hand welding either of the bare rod or coated rod variety. Furthermore, an inventive-level difference exists between their method and the automatic welding method taught by Robinoff. The physical appearances surrounding the welding zone in the Jones et al. method of welding differ from those in any of the prior methods of electric-arc welding. In bare rod and coated rod hand welding, the electric arc creates a blinding glare, and there is a great amount of smoke and splatter. In the Robinoff clay flux method constant flashings occur, and the arc is always at least partially visible. While in contrast to the appearances of those methods, there is no glare, no open arc, no splatter, and very little, if any, smoke in the Jones et al. method.

The truly remarkable difference, however, between what Jones, Kennedy and Rotermund invented and what had gone on before is perhaps best manifested by the performance achievements of their invention. For instance, only through its use can plates as thick as two and one-half inches be welded in a single pass. Furthermore, the welding speeds made possible by it dwarf those of any other method, and the welds produced by it are of the highest quality in contrast to the great amount of porosity contained in the welds produced by the so-called clay flux process.

Moreover, the commercial success of the Jones et al. method is persuasive evidence that this method is an improvement over the prior known methods. It is true that this commercial success has been confined principally to the sale and use of Unionmelt No. 20 in contradistinction to

other possible compositions taught by the patent. However, testimony by users of Unionmelt that the Jones et al. method permits faster welding, saves costs and constitutes a vast improvement over hand welding is highly convincing that the method under inquiry is an invention.

Since the patentees did invent something patentable over the prior art of electric welding, the collateral questions of what constitutes their invention, and what are its boundaries, become pertinent.

To answer these questions a basic issue in this case must be decided. That issue is whether a fundamental difference in phenomena exists between the Jones et al. method and all methods of electric arc welding. If it could be said without equivocation that the electric current passing between the electrode and the base metal travels through a welding composition which is in a melted or liquid state and that no "electric arc" is present, then a different electrical phenomenon would exist and a radically new process in electric welding would have been discovered. But no such finding can be made. The evidence is persuasive that no such basic difference in phenomena is present in the Jones et al. method.

The inventors themselves did not initially conceive their invention as embodying any such radical departure from known phenomena. Historically, they saw the Robinoff clay flux process in operation at the Western Pipe and Steel Company. It was from that point in welding development that they began their experiments with welding compositions which they hoped would give a better weld than was being obtained by the Robinoff process, which undoubtedly involves an electric arc phenomenon. During the course of their experiments, they did evolve a composition or compositions which produced better welds. The operational use of their welding composition was the same as the clay flux in the Robinoff process; that is, from a purely operational standpoint, there was and is no difference between the Robinoff and the Jones et al. methods. In both methods, a deep layer of flux or welding composition is laid in the V formed by the beveled edges of the plates to be welded; a bare welding rod is fed down through this composition; and an electric current, which produces the heat to weld the plates, is conducted from the rod to the base metal. Thus, the physical operational steps in the two methods are identical.

In their first application for a patent, the patentees designated their invention as an "Improvement in Method of Electric Arc Welding and a Flux Therefor." The specification of this application is replete with references to the presence and use of an electric arc in the new method. It was only after they had assigned their rights in the invention to the plaintiff that the suggestion of a basically new kind of phenomena other than an arc began to be made.

When a deep layer of the patented welding composition is used, there is no visual evidence of an electric arc after the initial welding operation has begun. What actually occurs between the electrode and the base metal is hidden from view by the surrounding granular flux. Because one cannot see what is actually happening beneath the top layer of the flux in the normal welding operation, it is impossible to say with complete certainty that there is or is not an arc. Although some of the evidence submitted by the plaintiff indicates the presence of a phenomenon other than the electric arc, the plaintiff's expert witness, Dr. Doan, in effect admitted that the Jones et al. process involves an arc phenomenon. I am in accord with the following appraisal of his testimony stated in defendants' brief: "We submit that Dr. Doan's answers to the Court's questions, when considered together with his last-quoted testimony, amply establishes the following facts. In hand welding with a metallic electrode, the arc is initiated by making contact between the end of the electrode and the plate. The arc is immediately established and the arc consists of an ionized gaseous medium through which the current flows with bare rod and no flux, ionized particles of the air participate in the conducting gaseous medium, and are not conducive to the production of sound weld metal. With the coated elec-

trode, however, any initial and momentary participation of air particles is immediately replaced by the coating of the electrode in ionized vapor state and thereby the air is excluded, resulting in the production of sound metal. Dr. Doan admits that this produces an arc of entirely different characteristics. Yet it is still an arc. The only difference between it and the unshielded arc is the result of the coating on the electrode providing the shielding means. Identically the same thing takes place under a deep layer of flux. When the arc is initially established before the flux is vaporized, some air particles are present in the ionized gaseous medium. Immediately, however, the flux becomes vaporized, participates in and surrounds the arc zone, and shielding takes place to produce sound weld metal. Yet Dr. Doan claims this is not the same arc that was initially established. Neither is it the case of the hand electrode, but in both cases it is still an arc and as such conducts the current from electrode to plate, and provides the requisite heat for the welding operation."

In addition to his oral testimony regarding the existence of an arc, Dr. Doan made this significant statement in his treatise entitled, "Conduction of Electric Current in an Ionized Gas or Liquid": "In the welding process of the Jones et al. patent the welding rod is negative and the plate positive (or vice versa) with the pool of fused composition between them. All of the pool is 'ionized.' Current thus flows throughout the pool between rod and plate. The concentration of heat is greatest at the center or core of the pool, and the composition there is vaporized. The ions and electrons there having greater freedom of movement, a larger proportion of the current is made up of their charges. But throughout the pool, both in its vaporous core and surrounding liquid mantle, the mechanism of current conduction is basically the same, viz.: a progression of positive ions in one direction and of negative ions and electrons in the other."

Finally, I do not understand the plaintiff to dispute the view that its process involves the existence of an arc phenomenon. In its reply brief this concessionary statement appears: "Second, the process of the patent-there is contact, and a vaporous core or arc is entirely sealed in; * * *. The fact is that (this) * * * is directly within the teachings of the patent and it is the actual operation which takes place in the Unionmelt and Lincolnweld processes."

Granted then that an arc exists, the question remains whether it has different characteristics than the arcs employed in the processes taught by the prior art of electric welding. Considering the phenomenon per se, it would appear that the conduction of electric energy in an ionized element which is in a gaseous or vaporized state is common to all electric arcs. In that respect there is no difference between the arc in the Jones et al. process and any other arc. The difference is not in phenomena but in the element or elements constituting the "ionized" area of the arc operation and surrounding it. In bare rod welding, the dominant element in and around the arc is air. In covered rod welding, the fluxing material at least partially replaces the air. In the Robinoff clay flux method it is again the flux which at least partially replaces the air. In the Jones et al. method it appears that the vaporized area of ionization constituting the arc zone is entirely blanketed and shielded by a mantle of fused welding composition. It also appears that the arc area within this mantle is composed predominately of vaporous welding composition.

The plaintiff contends that the submergence of the tip of the welding rod in the pool of fused flux is the key feature of the invention; or as stated in the argument, the unique feature is the contract of the welding rod with the fused pool of flux. If by this contention is meant that between the end of the welding rod and the vaporous arc zone there is an area of fused flux, it is not sustained by the evidence. Plaintiff's exhibit 173 is sufficient contradiction. What does seem evident is that the welding rod somewhere above its very end is in contact with, or rather is surrounded by, the pool of fused flux and that the arc zone, the vaporous ionized area between the end of the electrode and base metal, is sealed

in by a sheath of molten flux in the form of a cap above the base metal and in part of this pool there is entwined fused molten metal. The positive and negative terminals of the electrode and the base plate are within this vaporous ionized area.

The distinctive characteristics of this arc zone, viz.: the dominant element making up the vaporous ionized area and the protective surrounding sheath of molten substance, can be attributed only to the peculiar properties of the welding composition which is employed. The mechanical operational steps involved are identical with those used by Robinoff. Indeed, the patentees who started with the teachings of Robinoff merely sought an improved welding composition or flux to be used with his operational method. Their experiments dealt solely with welding composition and the type and amount of electric current to be used to effect their objective. They discovered what they sought—compositions which when employed in a welding operation taught by Robinoff give a vastly improved weld over Robinoff, which permit the welding of far thicker plates in a single pass and at a speed many times faster than attained by any prior known method, and which completely eliminate the splatter and blinding glare of the so-called open arc.

The collateral questions of what constitutes the invention and what are its boundaries have been answered only partially. The remaining part of these questions concerning what the welding compositions discovered by the inventors were, must await answer in the discussions of the validity of the patent in issue and of the question of infringement.

However, before taking up those discussions another matter must be treated. The inventors having discovered a new and useful welding composition that can be used successfully with the mechanical operations taught by Robinoff, the question of whether they also invented a new process of welding arises. When considered on the level of the apparatus and the mechanical manipulations employed in the process, the Jones et al. method is no different than that disclosed by Robinoff. Likewise, when considered from the standpoint of whether a new scientific principle or phenomenon is involved the Jones et al. method presents no new process. On the other hand, it does involve an arc phenomenon that is created in a different medium than that taught by Robinoff. It also involves an arc phenomenon that is encased in a mantle of molten flux as distinguished from the Robinoff method in which the arc is at best only partially sheathed in the clay flux. Accordingly, if the criteria for determining a new process are that it need not be limited to changes in physical operational manipulations nor be of such high order as to involve fundamental changes in physical phenomena, then a new process is involved in this invention. Those I believe are the criteria which the courts have used in determining the question of whether a new process has been discovered. The Supreme Court in Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139, laid down this definition of a patentable process: "A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

The "certain substances," that is, the compositions used in the Jones et al. method, are different from those used in the Robinoff method. A new result ensues, to-wit: an arc operating in different surroundings. Therefore, a new process of welding has been discovered.

The preceding paragraphs have been devoted mainly to the expression of determinations regarding the invention itself. It now becomes necessary to construe the patent in light of those determinations.

It has been pointed out before that the patentees described initially their invention in terms of a new welding method, in which an arc process is involved. After their rights to a patent had been assigned, a change in theory of operation in the scientific principle sense began to be evolved. This shift of theory is quite evident from the three successive applications filed for this patent. The new theory advanced in the second and continued in the third application, but never unequivocally espoused, is that the electric current passing between the electrode and the base metal flows through a conductive melt, that is through the flux, while it is in a melted state, rather than through a vaporous or gaseous medium such as occurs in an arc phenomenon. The defendants suggest this change in theory was evolved solely for patent coverage purposes. No direct finding to that effect can be made. However, it is significant that the idea of a radically different scientific principle came not from the inventors, but from plaintiff's patent solicitors.

That the initial idea of the inventors, i. e., that they had an improved method of "submerged" arc welding, was never completely abandoned is evident from both the patent and the applications for it. For example, the patent recites: "Several circumstances show clearly that our process does not depend on the formation of an arc of the *usual* type." (Emphasis supplied.) To like effect, the second application states: "Applicants' specification has been slightly amended where it discusses the theory of their process, and compares this process with prior arc processes. It is immaterial to the patentability of the invention whether applicants are able to give the correct theory or not, but it is their purpose to give the examiner the fullest information in their possession on this matter. It is difficult, if not impossible, to define an arc precisely, and applicants have contemplated the possibility that a definition may be framed in such terms as to embrace the phenomenon which occurs in their process. There can be no question, however, that there is no such arc involved in their pro-

cess as occurs in every prior arc process, including that of Robinoff et al."

■ ▇ The patent's specification contains a sufficient disclosure of the method of welding invented to enable persons "skilled in the art" to accomplish the objectives by following the teachings outlined in it. This, in my opinion, is the test of this point of validity regardless of whether an erroneous theory of operation is advanced. As stated in Westinghouse Electric & Mfg. Co. v. Montgomery Electric Light & Power Co., 2 Cir., 153 F. 890, 901: "The fact that the patentee did not fully understand the principle upon which his invention operated, or that his instructions were capable of a construction which would render the patent impracticable and defeat its purposes, should not deprive him of the benefit of a meritorious invention, provided it appears, as is found in this case, that the patent sufficiently disclosed to those skilled in the art the cause of the previous defects and a new and useful discovery and invention, by means of which they might be successfully overcome. He is not to be deprived of the benefit of his invention because he may have been mistaken in his statement of the reasons why the result was secured, or may have failed to correctly state the theory of their operation."

Specifically in regard to the validity of the claims in issue it first should be pointed out that claims 1, 3, 4, 7, 8, and 9 make no reference to the chemical constituents of the welding composition to be used in the novel process discovered by the patentees. It is evident that the welding composition discovered by the inventors is the heart of the invention. The specification, except for references to prior art and objectives, deals with the properties of and the method of preparing a new welding composition. Indeed, the patent recites, "The composition of the welding medium is of the utmost importance."

■ ▇ The welding compositions in these six process claims are described therein as follows: a "chemically stable fusible material having at welding temperatures sub-

stantially the fluidity and electrical conductivity of a fusible silicate," (Claim 1), "a fused nonmetallic material," (Claim 3), "a pool of nonmetallic material fused in situ," (Claim 4), "a finely divided unbonded nonmetallic material which is fusible at welding temperatures," (Claim 7), "unbonded particles of a prefused solidified and ground material capable of refusion in situ and active when fused to cleanse the fused depositing metal of an electrode," (Claim 8), and a "pool of material fused in situ without substantial gas evolution, said fused material being electrically conductive and active to cleanse the fused metal of the electrode and the work," (Claim 9). Since these six claims make no reference in any manner to the identity of the composition except in these general terms, it is my view that they are too broad and indefinite. Therefore they are invalid because they do not comply with section 33 of Title 35 of the United States Code.

▮ Process claims 5, 6, 11, 12, 13, 14, 15, 16 and 17 are invalid for another reason. The import of each of these claims is that the sole conductive medium through which the electric current passes from the electrode to the base metal is the welding composition which is in a molten state and that the electric arc phenomenon is not present. To make a claim for a welding process in which these erroneous ideas are incorporated is to stake out a process or means of welding which does not in point of fact exist within the invention. While a patent covering a meritorious invention should not be struck down because the patentee has misconceived the scientific principle of his invention, the error cannot be overlooked when the misconception is embodied in the claim.

Claim 2 recites that the method of welding invented "comprises supplying an electric current * * * substantially wholly through a pool of silicate fused in situ, without the formation of any substantial gas-conducted electric arc." This part of the claim implies that an arc other than a "substantial gas-conducted" one may be the means wherein the heat or energy for the welding is generated. Such a construc-

tion might save Claim 2 except that its validity is further dependent upon the sufficiency of its description of the welding composition.

In view of what has just been said regarding process Claim 2, it now becomes appropriate to decide whether the composition claims in issue are properly and validly drawn so as to afford the inventors a reasonable scope of protection for the welding compositions invented and disclosed by them. In an early paragraph of their specification, the inventors state: "We have used calcium silicate and silicates of sodium, barium, iron, manganese, cobalt, magnesium, nickel, and aluminum, both in binary and ternary combinations, in various proportions. We have also used calcium titanate and various titano-silicates, these being used when it is desired to introduce titanium into the weld metal. While a number of these conductive welding compositions are more or less efficacious in our process, we prefer to use silicates of the alkaline earth metals, such as calcium silicate, and we also prefer to add to these silicates minor proportions of alumina and of a substance adapted to lower the melting point, for example, a halide salt."

Although in later paragraphs of the specification the inventors point out that other materials such as borax and boric acid as fluxing agents and ferro manganese, ferrosilicon, ferrochromium, calcium molybdate, and carbon as materials inducible into the weld metal may be added to the welding composition, those materials are not essential to its successful operation but are simply optional to the accomplishment of functions other than the creation of a novel electric arc welding medium which is the essence of the invention under inquiry.

Despite defendants' arguments concerning the proper meaning of the clause "While a number of these conductive welding compositions are more or less efficacious in our process," a fair construction of it is that the invention includes compositions of those silicates mentioned and that the inventors found a number of

them will accomplish the objectives of the patent more effectively than others of the group.

The inventors further state in this paragraph of specification that they prefer to use "silicates of the alkaline earth metals such as calcium silicate," and, in the next paragraph of specification, that their welding composition preferably comprises as its principle ingredients "silica * * * at least one basic constituent of an alkaline earth such as lime * * * or magnesia * * * or a mixture thereof, and alumina * * *."

■ What is ordinarily meant by the alkaline earth metals are calcium, magnesium, barium and strontium. Two of these, lime (calcium oxide) and magnesia, are listed in the patent as preferred basic constituents. The patentees say that they have also used barium silicate, which fact is substantiated by Mr. Kennedy's oral testimony. The import of the evidence on this score is that barium can be substituted effectually for lime or magnesium in the composition taught by the inventors in their patent. It may be noted however that the use of barium silicate as a welding composition is not commercially feasible because of its prohibitive cost. Although strontium is neither mentioned in the patent nor in the experimental notes of the inventors, the oral evidence is to the effect that it likewise can be used effectually as a basic component in the novel welding composition. Accordingly, in the light of these foregoing facts claims listing an alkaline earth metal silicate as a major constituent of the novel welding composition are valid if in other respects they meet the requirements of section 33 of Title 35, United States Code. It is my opinion that composition claims 18, 20, 22 and 23 meet those requirements and are valid claims.

■ Claim 27 reads in part, "A prefused electric welding composition which is conductive when molten * * *." Although that claim designates alkaline earth metal silicates as the principal constituents of the composition, the inevitable impression given by the quoted language is that the electric current passes solely through the composition while it is in a molten state. Accordingly, this claim is invalid for the same reasons mentioned in the discussion of process claims 5, 6, etc.

■ Neither claim 24 nor claim 26 is limited to alkaline earth metal silicates. The one claims a new fluxing material comprising "metallic silicate and calcium fluoride" and the other claims an electric welding composition consisting chiefly of "silicates." The evidence is clear and convincing that many silicates, even many metallic silicates, are inoperative as major constituents in a welding composition having for its objectives those stated in the patent. This central fact renders these broad claims invalid.

In its brief plaintiff asserts, " * * * two claims (i. e., claims 24 and 26) make no reference to alkaline earth materials whatsoever, and must be construed specifically to cover all nine metallic silicates set forth in the specifications and their equivalents." The answer to this assertion is found in Aluminum Co. of America v. Thompson Products Co., Inc., 6 Cir., 122 F.2d 796, 798. There as here, the patent owner asked to have broad claims narrowed by judicial construction to the scope of the invention disclosed in the specification. On that point the Circuit Court of Appeals for the Sixth Circuit said:

"It urges upon us the application of the rule that claims must be read and construed in the light of the specification and so liberally interpreted as to uphold and not destroy the right of the inventor in the substance of his invention. Westinghouse Electric & Manufacturing Co. v. Quackenbush, 6 Cir., 53 F.2d 632, and cases therein cited. We are of the opinion that the rule there applied is limited to claims that are ambiguous and so require construction, and is in no event applicable where it appears to be clear that the inventor sought a broader monopoly than would seem to be justified by his invention as he has described it. Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210; Union Switch & Signal Co. v. Kodel Elec. & Mfg. Co., 6 Cir., 55 F.2d 173; In re Lowry, 93 F.2d 909 [25 C.C.P.A., Patents, 829]; Cf. Kalle & Co. v.

Multazo Co., 6 Cir., 109 F.2d 321. In the first of the cited cases the general rule is clearly stated to the effect that a claim which is capable both of broad and narrow construction in the light of the specification will be given that construction which sustains the patent, but therein it is held that 'where, from the specification or the history of the application or the language of the claim it is clear that the patentee intended to claim and the Patent Office intended to grant the broader monopoly which turns out to be invalid, the courts will not, for the arbitrary purpose of saving the claim, read into it a limitation which it does not have.'

"The appellant would have us interpolate into the defeated claims of its patent a limitation upon the silicon content of the patented alloy not there expressed. Not only are the claims held to be invalid without ambiguity, but it would appear to be clear that the inventor intended to claim the broader and not the more limited monopoly."

■ What has just been said about claims 24 and 26 applies equally to process claim 2.

Inasmuch as claims 18, 20, 22 and 23 are valid, the question of infringement becomes pertinent. Essentially the accused welding composition comprises manganese silicate to which has been added a small amount of calcium fluoride. The following comparison between the Unionmelt and the Lincolnweld compositions was made by Dr. Willard: "So we have here in one case (Unionmelt) a silicate of calcium and magnesium with a little aluminum, and with calcium fluoride, and in the case of Lincolnweld we have silicate of calcium and manganese with a little aluminum and calcium fluoride added."

The two compositions are identical in operation, and the same kind of weld is produced by them. The mechanical methods in which these compositions are employed are essentially similar. A fair construction of the evidence is that Lincolnweld 660 flux can be substituted for Unionmelt Grade 20 without any change in operation or result except that Lincolnweld composition induces a greater amount of manganese into the weld metal. It is clear then that for all practical purposes, manganese silicate can be efficiently and effectually substituted for calcium and magnesium silicates as the major constituent of the welding composition.

■ Although manganese in its bivalent form has some characteristics of an alkaline earth metal, it is not classed as such in chemical literature. Since the accused flux is composed principally of manganese silicate, it does not literally infringe composition claims 18, 20, 22 and 23. Whether it actually infringes these claims depends upon what application is made of the doctrine of equivalents. In that connection, no determination need be made whether it is a known chemical fact *outside* the teachings of the patent that manganese is an equivalent of calcium or magnesium. In the patent the inventors state, "We have used calcium silicate and silicates of sodium, barium, iron, manganese, cobalt, magnesium, nickel and aluminum, both in binary and ternary combinations, in various proportions." Thus, the fact that manganese is a proper substitute for calcium silicate as a major ingredient of the welding composition invented by Jones, Kennedy and Rotermund is fully disclosed in the specification of their patent. The defendants have urged a construction that would have the sentence in question read, "We have used calcium silicate *with* or *plus* silicates of sodium, etc." It is my view that the correct construction of the sentence is, "We have used calcium silicate and *also* silicates of sodium, etc." That this in the correct view is borne out by the first application. That document in part recites: " * * * and there are other materials suitable to form the main body of the flux. Magnesium silicate, manganese silicate or these in combination serve admirably. * * * Particular fluxes that we have used are as follows: * * * (2) manganese silicate $MnO.SiO_2$ * * *.". Accordingly, it is concluded that the patent itself fully discloses that welding compositions composed chiefly of manganese silicate and prepared according to the teachings of the patent are equivalent to those in which the alka-

line earth metals are the principal constituents.

In this connection, the lack of any evidence of independent research or experiments by the Lincoln Electric Company in originating Lincolnweld 660 flux creates an inference that the teaching of the patent in suit was the sole origin of that composition.

The defendants contend that if it be determined that the Lincolnweld composition containing a major proportion of manganese silicate infringes any of the composition claims in issue, such claims have been completely anticipated by Miller Patents Nos. 1,741,031, 1,748,785 and 1,754,566, particularly the latter, which teaches the use of a manganese silicate coating in electric welding. But that Miller patent did not teach all that the Jones et al. patent does concerning an improved composition suitable for the welding method discovered by Robinoff. For example, that Miller patent reads in part: "Instead of preformed manganese silicate the coating may contain material adapted to react at the temperature of the metal-depositing operation to produce manganese silicate. This is the preferred form of the invention as it permits one operation to be dispensed with. The coating may contain for example an oxide ore of manganese and any finely divided form of silica. As in the case of the preformed silicate, the proportions may be such that $MnO.SiO_2$ or a more basic or acidic silicate will be formed."

The patent in suit requires that the acidic and the basic constituents of the composition be prefused or reacted, for it states as follows: "The chemical condition of the welding composition or medium is important: the acidic and basic constituents should be reacted, the composition should be substantially anhydrous and free from gases, and all reactions which would evolve deleterious amounts of gases during welding should be substantially completed, before the medium is used in the welding process."

Therefore, it cannot be said that the composition claims herein held valid are anticipated by the teachings of Miller.

The remaining issue in the case is the alleged misuse of the patent in suit by the plaintiff. The defendants contend that the plaintiff requires as a condition for a license that its licensees use unpatented weldrod furnished by it. In support of this contention typical forms of license agreements and rod purchase contracts used by the plaintiff were introduced into evidence. Although the license agreements are separate documents from the rod purchase contracts, about ten percent of the existing license agreements and rod purchase contracts were executed on the same day by the licensee. Other documentary evidence indicates that the plaintiff instructs its sales force to avoid practices which could be interpreted by a prospective licensee as requiring him to execute a rod purchase contract as a condition of obtaining a license.

The defendants argue that the entire picture presented on this point indicates that a "tie in" requirement is imposed upon the licensee and that the plaintiff is doing by indirection what it may not do in a direct manner. This inference for which the defendants contend is not buttressed by evidence that any licensee has actually felt compelled to sign a rod purchase contract as a condition of obtaining his license.

A patent owner may legitimately engage in selling unpatented material usable with the patented article or process licensed by him, but he cannot legally require the licensee to purchase such material from him as a part of the licensing arrangement. Unless it could be found that plaintiff's entire licensing conduct is merely a subterfuge, it is hard to conceive what more plaintiff could have done to safeguard itself from charges of having unduly broadened its patent monopoly. The evidence does not warrant a finding that the plaintiff's licensing conduct is a subterfuge. Therefore, it is concluded that the defendants have not met the burden of proving that the patent has been misused.

Findings of fact and conclusions of law in accord with this opinion are herewith being signed and entered.

Counsel for the plaintiff shall submit a form of judgment and decree in conformity with the conclusions of law to defendants' counsel within ten days and to the Court within fifteen days from date.