**Tomas HIRSCHFELD, Marvin Margoshes, and Block Engineering, Inc., Plaintiffs,**

v.

**Donald W. BANNER, Commissioner of Patents and Trademarks, Defendant.**

Civ. A. No. 75–1147.

United States District Court, District of Columbia, Civil Division.

Nov. 20, 1978.

Robert J. Schiller, Schiller & Pandiscio, Waltham, Mass., Robert R. Priddy, Washington, D.C., for plaintiffs.

Thomas E. Lynch, Associate Sol., Washington, D.C., for defendant.

MARKEY,* Chief Judge.

### Findings of Fact

1. Plaintiffs Tomas Hirschfeld, Marvin Margoshes, and Block Engineering, Inc. brought this action under 35 U.S.C. § 145, seeking to have this court authorize defendant Donald W. Banner, Commissioner of Patents and Trademarks, to issue a patent containing claims 12, 13, and 15, the only claims at issue in plaintiffs' application entitled "Digitally Controlled Electro-Optical Imaging System," serial No. 117,285, filed February 22, 1971. The inventors are Tomas Hirschfeld and Marvin Margoshes. The application is assigned to Block Engineering, Inc.

2. The invention is directed to a digitally controlled television camera tube, such as a secondary electron conduction (SEC) vidicon. Individual points of an image formed on the target element of the tube are read by generating and positioning an electron beam. An output signal, produced in correspondence with the intensity of the radiation at the point being read, is digitized and stored in a computer. The electron beam is directed to a specific point on the target by computer-provided digital address signals converted into control voltages to position the beam. Because of the rapid point-by-point readout of the target, some points in weakly illuminated areas of the image do not accumulate sufficient stored charge to be read as frequently as points in the highly illuminated areas. Plaintiffs' system increases the dynamic range of the vidicon by generating the electron beam at a repetition rate for each point in relation to the intensity of radiation falling on that point. Points exposed to low intensity radiation are thus read only when the illumination signal has been sufficiently integrated to yield an acceptable signal-to-noise ratio.

3. The claims at issue are:

15. In combination with an electro-optical imaging device having target means for receiving an image and means for generating an electron-beam for reading the image formed on said target means in said device, said target being capable of integrating the radiation falling on each point thereof, means for controlling the lateral deflection of said electron beam, and means for providing output signals corresponding to the intensity of the image as read by said

---

* Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

electron-beam means, a digital control system comprising:

means for storing a plurality of pairs of digital signals, each corresponding to a pair of coordinates of a corresponding predetermined point on said target; means for converting selected pairs of said digital signals to corresponding pairs of analog-valued control signals; means for applying said control signals to said means for controlling said lateral deflection, and;

means for activating said means for generating said beam at a repetition rate for each of said target points in relation to the intensity of the radiation falling on each of said target points for a unit time interval.

12. The combination as defined in Claim 15 wherein said repetition rate is substantially inversely related to the said intensity.

13. The combination as defined in Claim 15 including means for establishing a plurality of categories of pairs of digital signals according to the relative intensity during said time interval of the image points corresponding to said pairs of digital signals.

4. Plaintiffs and defendant filed a stipulation, this court consenting, to the issue as arising under 35 U.S.C. § 112:

[T]he sole issue arising out of the Examiner's Answer and the decision of the Board of Appeals . . . is whether or not the specification . . . contains a written description of the invention claimed in claims 15, 12 and 13 in [the] application, and of the manner and process of making and using such invention sufficient to enable any person skilled in the art to which said invention pertains, or with which said invention is most nearly connected, to make and use the same.

5. The stipulated 35 U.S.C. § 112 issue concerns, *inter alia*, the following drawings disclosed in the specification:

FIG. 1.

FIG. 2.

FIG. 3.

The figures are schematic block diagrams, in which Figure 1 represents a digitally controlled camera system, Figure 2 depicts in general the organization of the data storage and control means 36, and Figure 3 represents an operational flow diagram of the system of Figure 1. The specification states at page 9, line 1–13 that:

[T]he organization of storage and control means 36 is typical of a simple computer system and includes necessarily a command memory or table 46 in which various orders or commands can be stored under appropriate addresses, an address table 48 for containing all of one set of coordinates such as X coordinates, and another address table 49 for storing all the other set of coordinates, such as the Y coordinates. Additionally, storage and control means includes a word counter 50, a storage or memory means 51 and a logic section 52 organized to carry out the function shown in the sample program flow chart of Figure 3. All of the foregoing elements being quite conventional in the art, require no further description here.

The specification also discloses that the operational flow diagram of Figure 3 can be accomplished with data storage and control

means 36 as an appropriately programmed general purpose digital computer.

6. In describing the operation of the system to generate the electron beam at a repetition rate for each image point in relation to the radiation intensity at each such point, the specification states at page 12, line 18 through page 13, line 14 that:

> [A]ddresses can be provided for storage in tables 48 and 49 respectively by entry through keyboard 42. However, it will be apparent that the requisite data can also be obtained by interrogations or examinations of the target area to determine what image points should be read according to some predetermined parameter. For example, the system can be instructed to complete a full raster scan and generate the coordinates of all image points or resolution elements that provide a signal below a first selected amplitude. These signals, whether self-generated or fed in through the keyboard, are recorded in memory 51, for example, in a first "low" intensity register. All points providing a signal above the first but below a second selected amplitude are recorded in memory 51 in a second "low" intensity register, and so forth until all image points have their respective coordinates stored accordingly as they are classified as to brightness. If now the image is restored to the target of the vidicon, for example, one can provide appropriate logic which will command the selective readout of the image points according to their brightness. Thus, the strongest intensity points are read out at the highest repetition rate and the weaker points are read out less frequently.

7. The final rejection under 112 for lack of enablement was principally directed to the logic section 52. The examiner contended that the selection or design of the logic section was neither clearly within the established ordinary skill of the art, nor determinable with little or no experimentation.

8. In agreeing with the examiner's conclusions, the Patent and Trademark Office Board of Appeals (board) gave the following additional analysis:

At the outset we note that no specific computer is cited in the disclosure as an exemplary such element for implementing data storage and control element 36 or the various blocks shown in Figure 2, for example. Additionally, we note that no general purpose computer will perform as appellants wish, unless it is properly programmed. We further note that the flow chart shown in Figure 3 would appear to be directed toward implementation of operations . . . wherein information stored at various addressable locations of the target may be read and stored in memory 51, or erased from the target area. We find no program or even a flow chart for implementing the operation claimed and described . . . [in] the specification, wherein all the image points of the target are classified as to brightness, and the coordinates of the classified image points are stored in memory 51 in a particular manner. In our view, even if a routineer in the art selected an exemplary general purpose computer to implement element 36, further selected other exemplary elements to implement the other blocks shown in Figure 1, and still further programmed the computer so as to implement the flow chart shown in Figure 3, the results obtained would not appear to be that which is set forth in the claims at bar.

. . . In our view, the instant disclosure fails to disclose in full, clear and exact terms how such elements, if they exist, may be selected, interconnected, timed, programmed and controlled so as to obtain the system operations claimed. As such, we view appellants' disclosure as little more than an invitation to those skilled in the art to experiment extensively so as to reduce the system to practice. Compliance with requirements of the first paragraph of 35 U.S.C. § 112 is not obtained merely because one of ordinary skill in the art might after extensive experimentation along the line indicated in the disclosure, find out how to make and use the invention claimed. The disclosure itself must furnish such information.

9. The art to which the claimed invention pertains is the computer control of optical systems.

10. Witness David S. Grey is skilled in the art of computer-controlled optical systems.

11. In June of 1975 plaintiffs' attorney presented Grey with a copy of the specification, drawings, and claims of plaintiffs' application and asked him whether the disclosure contained adequate teaching to enable one skilled in the art to make and use the invention as claimed. No other information was given to Grey. Prior to his receipt of the application, Grey did not know of its existence.

12. Grey, using computer programming techniques known by those skilled in the art prior to February 1971, wrote a general computer program for implementation of the embodiment of Figures 1–3 within four hours after receipt of the application. The program contained certain routine programming errors of the type customarily expected and eliminated during a routine "debugging" operation. Such errors would quickly and easily be eliminated by one skilled in the art. Grey's program was not written for any specific computer and therefore contained some general portions written in English rather than the Fortran IV computer language used elsewhere throughout the program. The details for completing the program for a specific computer installation would require no undue experimentation on the part of one skilled in the art.

13. Prior to February 1971, a number of general purpose digital computers which would accept Fortran IV computer language were commercially available. Typical of such computers were IBM 360, IBM 7090, IBM 7094, and CDC 6000 series.

14. When completely debugged of routine programming errors and adapted for use with a specific computer installation comprising one of the general purpose computers available as of February 1971, the program written by Grey would implement the functions described in the specification at page 2, line 3–8, 19–22; page 6, line 5–14; page 12, line 1–9; and page 12, line 20 through page 13, line 15.

15. The witness, Robert B. Turner, was by stipulation an expert in electrical engineering and computer programming.

16. Turner became generally familiar with the subject matter of plaintiffs' invention about the winter of 1973–74. Turner was not involved in the original design or development of the invention, known as the TVS project, but did understand that the project involved increasing the dynamic range of a television camera tube by reading and accumulating the value of image points according to intensity, the lower intensity image points being read least frequently to allow the tube to integrate these points.

17. When presented with a copy of Grey's program, Turner recognized it as a program for the TVS system after less than ten minutes of study and stated that it appeared to provide for scanning the X–Y coordinates of an imaging tube and for reading and storing values of selected image points in proportion to the rate at which each image point accumulated data.

18. Plaintiffs' independent claim 15 is written in *Jepson* form, viz., portions relating to the prior art appear in the preamble. The limitations recited in the preamble are specifically described in the specification at page 2, line 19 through page 4, line 3.

19. The claim 15 limitation, "means for storing a plurality of pairs of digital signals, each corresponding to a pair of coordinates of a corresponding predetermined point on said target," is depicted as memory 51 in Figure 2 and described in the specification text at page 9, line 1 through page 10, line 18.

20. The claim 15 limitation, "means for converting selected pairs of said digital signals to corresponding pairs of analog-valued control signals," is depicted as the digital-to-analog converters 32 and 34 of Figure 1 and described in the specification text at page 10, line 2–7.

21. The claim 15 limitation, "means for applying said control signals to said means for controlling said lateral deflection," is depicted as lines 25 and 27 in Figure 1 and described at page 7, line 17 through page 8, line 14.

22. The claim 15 limitation, "means for activating said means for generating said beam at a repetition rate for each of said target points in relation to the intensity of the radiation falling on each of said target points for a unit time interval," is specifically described at page 12, line 18 through page 13, line 15.

23. The claim 12 limitation, "wherein said repetition rate is substantially inversely related to the said intensity," is described at page 13, line 12–15.

24. The claim 13 limitation, "means for establishing a plurality of categories of pairs of digital signals according to the relative intensity during said time interval of the image points corresponding to said pairs of digital signals," is described at page 13, line 16 through page 14, line 2.

25. The claim limitations quoted in findings of fact 22–24 describe functions carried out by the disputed logic section 52, which together with memory 51, command table 46, address tables 48 and 49, and word counter 50, comprises data storage and control means 36, a conventional general purpose digital computer programmed in the manner described by Grey.

26. Defendant presented no witnesses. Its limited cross-examination of witnesses Grey and Turner produced no change and reflected no weakness in their testimony.

27. The new evidence introduced by plaintiffs at trial thoroughly convinces the court that error occurred in the rejection of claims 15, 12, and 13 for insufficient disclosure under 35 U.S.C. § 112, first paragraph.

28. The court granted defendant's MOTION FOR LEAVE TO AMEND ANSWER filed September 26, 1978, the eve of trial, and denied plaintiffs' related MOTION TO LIMIT ISSUES AT TRIAL. In the amended answer defendant asserts as an additional defense the unpatentability of claims 15, 12, and 13 under 35 U.S.C. § 101 "as being directed to a mathematical algorithm at the point of novelty," citing *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451, 198 USPQ 193 (1978).

29. Claims 15, 12, and 13 recite no mathematical equation, formula, or method of calculation, either in traditional mathematical symbols or as a prose equivalent thereof.

*Conclusions of Law*

1. In a 35 U.S.C. § 145 action, the Patent and Trademark Office (PTO) decision that claims are not patentable, for lack of sufficient disclosure under the first paragraph of 35 U.S.C. § 112 is entitled to great weight, amounting to a presumption of correctness. Nonetheless, this court must conclude that the applicants are entitled to a patent where new evidence has been introduced which "thoroughly convinces" the court that error has occurred. *Cf. Corning Glass Works v. Brenner,* 152 U.S.App.D.C. 262, 263–64, 470 F.2d 410, 411–12, 175 USPQ 516, 517 (1972); *DeSeversky v. Brenner,* 137 U.S.App.D.C. 369, 370, 424 F.2d 857, 858, 164 USPQ 495, 496 (1970); *California Research Corp. v. Ladd,* 123 U.S.App. D.C. 60, 65, 356 F.2d 813, 818, 148 USPQ 404, 408 (1966); *Tietig v. Ladd,* 228 F.Supp. 637, 639, 141 USPQ 372, 374 (D.D.C.1964) ("clearly erroneous or lacks a rational basis").

2. In an action under 35 U.S.C. § 145 the record produced before the PTO forms the evidentiary nucleus before the district court, but additional evidence is admissible to support contentions advanced by the plaintiff in the PTO. *Monsanto Co. v. Kamp,* 269 F.Supp. 818, 822, 154 USPQ 259, 260 (D.D.C.1967); *see DeSeversky v. Brenner, supra.* Defendant does not challenge the admissibility of plaintiffs' evidence in this case, except to note that evidence of enablement, which is not limited to supporting points made before the PTO, is inadmissible. The evidence offered by plaintiffs was so limited.

3. "Employment of block diagrams and descriptions of their functions is not fatal

under 35 U.S.C. § 112, first paragraph, providing the represented structure is conventional and can be determined without undue experimentation. *In re Ghiron*, 442 F.2d 985, 58 CCPA 1207, 169 USPQ 723 (1971)." *In re Donohue*, 550 F.2d 1269, 1271, 193 USPQ 136, 137–38 (Cust.&Pat.App.1977). *See In re Gunn*, 537 F.2d 1123, 1127–28, 190 USPQ 402, 405 (Cust.&Pat.App.1976).

4. It is not opinion evidence directed to the ultimate legal question of enablement, but rather factual evidence directed to the amount of time and effort and level of knowledge required for practice of the invention from the disclosure alone, which can be expected to rebut a prima facie case of nonenablement. *In re Brandstadter*, 484 F.2d 1395, 1405–07, 179 USPQ 286, 293–95 (Cust.&Pat.App.1973); *In re Brown*, 477 F.2d 946, 951–52, 177 USPQ 691, 694–95 (Cust.&Pat.App.1973); *see In re Naquin*, 398 F.2d 863, 866, 55 CCPA 1428, 1431, 158 USPQ 317, 319 (1968); *cf. In re Gunn, supra.* Unlike the circumstances in *Brandstadter* and *Brown,* wherein nonenablement was sustained by the court, the witnesses here testified to facts establishing enablement. Hence this case is more akin to *Naquin* with respect to evidence offered to rebut a rejection under 35 U.S.C. § 112, first paragraph.

5. The first paragraph of 35 U.S.C. § 112 requires that the specification be complete enough to enable one of ordinary skill in the art to make and use the invention without undue experimentation. The prohibition of "undue" experimentation means that the need for a minimum amount of experimentation is not fatal. Every detail need not appear in the specification, if the skill of the art is such that what does appear enables one skilled in the art to make and use the invention. *In re Gaubert,* 524 F.2d 1222, 1226, 187 USPQ 664, 667 (Cust.&Pat.App.1975); *Martin v. Johnson,* 454 F.2d 746, 751, 59 CCPA 769, 775, 172 USPQ 391, 395 (1972). The specification need not describe the conventional nor disclose what the skilled already possess. *General Electric Co. v. Brenner,* 132 U.S.App. D.C. 323, 326, 407 F.2d 1258, 1261, 159 USPQ 335, 337 (1968).

6. Plaintiffs' specification describes the invention of claims 15, 12, and 13 in sufficient detail that one skilled in the computer control of optical systems could have made and used the invention as of the filing date by choosing then-existing computer and concomitant interface equipment and interconnecting and programming such equipment without undue experimentation.

7. Plaintiffs' specification satisfies the enablement requirement of the first paragraph of 35 U.S.C. § 112 with respect to claims 15, 12, and 13.

8. The PTO erred in rejecting claims 15, 12, and 13 for insufficient disclosure under 35 U.S.C. § 112, first paragraph.

9. Claims 15, 12, and 13 neither recite nor contain an "algorithm" within the meaning of that term in *Parker v. Flook, supra* and *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273, 175 USPQ 673 (1972). "We use the word 'algorithm' in this case, as we did in *Gottschalk v. Benson,* 409 U.S. 63, 65, [93 S.Ct. 253, 34 L.Ed.2d 273] to mean '[a] procedure for solving a given type of mathematical problem . . . .' " *Parker v. Flook, supra,* 437 U.S. at 585 n. 1, 98 S.Ct. at 2523, 198 USPQ at 195 n. 1.

10. A claim does not fail to state statutory subject matter merely because it requires a computer program for implementation. *In re Freeman,* 573 F.2d 1237, 1245, 197 USPQ 464, 470 (Cust.&Pat.App.1978).

11. A claim cannot be directed to a mathematical algorithm when the claim itself fails either directly or indirectly, to recite a mathematical algorithm. *See In re Freeman, supra,* at 1245, 197 USPQ at 471.

12. The invention of claims 15, 12, and 13 constitutes statutory subject matter under 35 U.S.C. § 101, whether the claims be viewed as drawn to apparatus or to a process expressed as means for performing the steps of that process.

13. On the present record, plaintiffs are entitled to a patent on the invention described in application serial No. 117,-285 and claimed in claims 15, 12, and 13.

14. The defendant should be authorized to issue such a patent upon compliance with the requirements of law.