**RAYTHEON COMPANY,**
Appellee/Cross-Appellant,

v.

**ROPER CORPORATION,**
Appellant/Cross-Appellee.

**Appeal Nos. 83–851, 83–853.**

United States Court of Appeals,
Federal Circuit.

Dec. 30, 1983.

Frank P. Porcelli, Boston, Mass., argued for appellant. With him on the brief were W.R. Hulbert and John M. Skenyon, Boston, Mass.

Martin J. O'Donnell, Boston, Mass., argued for appellee. With him on the brief were Robert A. Cesari and Steven J. Henry, Boston, Mass., Joseph D. Pannone and William R. Clark, Lexington, Mass., of counsel.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and KELLAM, Senior District Judge.*

MARKEY, Chief Judge.

Roper Corporation (Roper) appeals from a judgment of the United States District Court for the District of Massachusetts declaring U.S. Patent No. 4,028,520 ('520 patent), issued to Sumner H. Torrey and assigned to Roper, invalid for lack of utility and because its disclosure is non-enabling. Raytheon Company (Raytheon) cross-appeals a holding of nonobviousness, a finding of infringement, and a refusal to award attorney fees. We reverse in part, affirm in part, and remand.

## BACKGROUND

### A. *Prior Technology*

The Roper patent is directed to a "common cavity" oven capable of conventional thermal cooking, microwave cooking, and pyrolytic self-cleaning (*i.e.,* heating the walls to about 900° F. to break down soil baked thereon). Those three "modes" of operation (thermal cooking, microwave cooking, and self-cleaning) are not totally compatible.

At the time of the Torrey invention, cooking in a thermal oven required minimal amounts of air. Ventilation of thermal oven cavities was accomplished through an opening in the oven door, air flowing by natural convection from the opening upwardly through the cavity and escaping via a vent at the top of the cavity.

Microwave cooking involved radiation supplied by a microwave feed unit. The feed unit included a magnetron generating radiation and an antenna transmitting the radiation to the oven cavity. The radiation travelled from the magnetron to the antenna through a hollow metal tube called a waveguide. The magnetron had projecting fins to help dissipate heat. A fan or blower moved cooling air through the magnetron fins and power supply.

Microwave cooking produced more moisture than thermal cooking. To remove moisture vapors from the cavity of a conventional microwave oven, a blower or fan was employed to blow them out a vent at the cavity top. Microwave cooking also required maximum sealing of the cavity to prevent escape of microwave energy. Thus, the opening in the oven door of a thermal oven was not desirable in a microwave oven.

Inclusion of a self-cleaning mode further complicated the ventilation of an oven operable in the thermal and microwave modes. Though a limited air supply was needed to flush smoke and volatile products of self-cleaning, excess air caused combustion of those products. That combustion, known as "autoignition", produced sudden pressure that sought release through any opening, including "backflow" through the waveguide. Although autoignition occurred only occasionally, backflow was thought to contaminate ("foul") the waveguide with burnt food particles cleaned from the cavity walls. Moreover, if autoignition were fueled by even greater amounts of excess air, as when forced air removed moisture produced in the microwave mode, fire or explosion could result.

Self-cleaning common cavity ovens were first marketed in the mid-1960's, but by 1973, the General Electric and Litton ovens on the market still had ventilation problems. To meet those problems, the ends of the waveguides in those ovens were sealed to prevent fouling of the microwave feed unit by autoignition and backflow. As a result, moisture and steam developed in the microwave mode could not be removed by forcing air to the cavity through the waveguide. General Electric and Litton regarded this problem as serious enough to require customer warnings in their product manuals.

### B. *The Torrey Invention*

In 1973, Roper began work on a self-cleaning common cavity oven. Under Tor-

* The Honorable Richard B. Kellam, Senior District Judge, Eastern District of Virginia, sitting by designation.

rey's supervision, Roper developed an oven with proper ventilation during the microwave, thermal, and self-cleaning modes, and which, to Torrey's surprise, had no fouling problems.

In the summer of 1976, Roper marketed its oven nationally under its own name and through Sears, Roebuck & Company under the Kenmore label. About 24,000 have been sold, with no complaints respecting contamination of the microwave feed system. The Roper oven was and is a successful product.

Torrey's February 26, 1976 application for patent issued without amendment as the '520 patent on June 7, 1977. The patented invention is depicted by this simplified drawing, shown alongside a simplified drawing of the accused Raytheon oven:

ROPER'S OVEN                    RAYTHEON'S OVEN

In the Torrey invention, the microwave entry is located at the bottom of the oven cavity. Air to remove microwave cooking moisture is forced into the cavity through the microwave system. A pattern of small passages is provided in the wall of the waveguide so that a portion of the air from the blower, which cools the magnetron, flows through the waveguide and hollow conductor. When the blower is on, the air path is from the waveguide, through the cavity and venting through the top. When the blower is off, during thermal cooking and self-cleaning, convected air ventilates the cavity via the same path. The small passages are sufficiently screened to avoid leakage of radiation. The patent specification discloses a forced air flow of three to eight cubic feet per minute (cfm), and a convection flow of 0.5 to 2.0 cfm.

There are five independent and two dependent claims in the '520 patent. Claim 5, on which claims 6 and 7 depend, is representative:

5. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space of conforming shape, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, control means for operation of the thermal element within a normal temperature range for food preparation and at a high temperature level for a self-cleaning mode, the walls of the cavity being insu-

lated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply having a housing including a magnetron and blower, the blower having a blower inlet and arranged to draw in cooling air for discharge under slight pressure to the magnetron, a waveguide having an inlet connected to the magnetron and extending under the bottom wall of the cavity to terminate at an outlet, means for connecting the outlet of the waveguide to the inlet opening of the cavity for conduction of microwave energy into the cavity, the waveguide being open to passage of cooling air from the magnetron so at least a portion of the pressurized air from the blower and magnetron passes through the waveguide and into the cavity for ventilating the cavity when the magnetron and blower are turned on, the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is thermally convected through the blower inlet, magnetron, and waveguide into the cavity for final exit through the cavity air vent at the top thereof, the air passage through the blower, magnetron and waveguide being sufficiently constricted so that the air is convected in the self-cleaning mode at a level below that which is capable of pro-

ducing an explosive reaction with the products of thermal decomposition.

All claims are reproduced in the Appendix.

### C. District Court Proceedings

On September 9, 1980, Raytheon sued for a declaratory judgment that the '520 patent was invalid. Roper counterclaimed for infringement of all claims. After trial without a jury, the district court issued an opinion on January 20, 1983, and a judgment on January 28, 1983.

The district court declared the patent invalid because of a lack of utility required by 35 U.S.C. § 101[1] and the absence of enabling disclosure required by 35 U.S.C. § 112.[2] The district court also found that the Torrey invention was a commercial success, held that the invention would have been nonobvious,[3] and found that if the claims were valid, Raytheon would be liable for having infringed them.[4]

Because the case was not in its view an "exceptional" one, as required by 35 U.S.C. § 285,[5] the district court refused to award attorney fees to Raytheon.

### ISSUES

Did the district court err in (1) its judgment of invalidity under 35 U.S.C. §§ 101 and 112; (2) its holding of nonobviousness under 35 U.S.C. § 103; (3) its finding of infringement; (4) its failure to award attorney fees?

---

1. 35 U.S.C. § 101 states:
   Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

2. 35 U.S.C. § 112, paragraph one, states:
   The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

3. 35 U.S.C. § 103 states:
   A patent may not be obtained though the invention is not identically disclosed or de-

scribed as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

4. 35 U.S.C. § 271(a) states:
   Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

5. 35 U.S.C. § 285 states:
   The court in exceptional cases may award reasonable attorney fees to the prevailing party.

## OPINION

### A. Standard of Review

■ Raytheon argues the evidence *de novo*. As Roper correctly points out, this court does not review the fact record *de novo*. District court findings must be accepted unless they are predicated on an improper legal foundation, *see, e.g., W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540 at 1547 (Fed.Cir.1983), or unless they are shown by the party challenging them to be "clearly erroneous", *i.e.,* unless this court is left with the "definite and firm conviction that a mistake has been committed". *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). The clearly erroneous standard applies to findings, not to legal conclusions.

### B. Invalidity for Lack of Utility

■ Utility is a fact question, *see e.g., Wilden Pump v. Pressed & Welded Products Co.,* 655 F.2d 984, 988, 213 USPQ 282, 285 (9th Cir.1981); *Nickola v. Peterson,* 580 F.2d 898, 911, 198 USPQ 385, 399 (6th Cir. 1978), *cert. denied,* 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979). In determining utility, however, the claims must first be interpreted to define the invention to be tested for utility. Claim interpretation is a legal matter subject to review free of the clearly erroneous standard applicable to fact findings. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565 at 1569 (Fed.Cir. 1983).

In this case, the district court's holding that claim 1 is invalid must be affirmed, but its holding of invalidity for lack of utility in the inventions set forth in claims 2–7 must be reversed because the latter rests on an erroneous interpretation of those claims, as well as on other incorrect legal bases.

1. *The district court correctly interpreted and held invalid claim 1 but erroneously interpreted claims 3 and 4 as requiring prevention of backflow during autoignition.*

■ In *Linde Air Products Co. v. Graver Tank & Mfg. Co.,* 86 F.Supp. 191, 197, 75 USPQ 231, 235 (N.D.Ind.1947), *rev'd,* 167 F.2d 531, 536–37, 77 USPQ 207, 212 (7th Cir.1948), *aff'd, Graver Mfg. Co. v. Linde Co.,* 336 U.S. 271, 277–79, 69 S.Ct. 535, 538–39, 93 L.Ed. 672 (1949), certain process claims were held invalid because they included incorrect ideas and:

> To make a claim for a ... process in which these erroneous ideas are incorporated is to stake out a process ... which does not in point of fact exist within the invention. While a patent covering a meritorious invention should not be struck down because the patentee has misconceived the scientific principle of his invention, the error cannot be overlooked when the misconception is embodied in the claim.

*Accord, Noma Lites Canada Ltd. v. Westinghouse Electric Corp.,* 399 F.Supp. 243, 253, 186 USPQ 485, 493 (D.D.C.1975) ("When an incorrect or questionable theory of operation is included in a patent claim, that claim is invalid. 35 U.S.C. § 112."). Because it is for the invention as claimed that enablement must exist, and because the impossible cannot be enabled, a claim containing a limitation impossible to meet may be held invalid under § 112. Moreover, when a claim requires a means for accomplishing an unattainable result, the claimed invention must be considered inoperative as claimed and the claim must be held invalid under either § 101 or § 112 of 35 U.S.C. *See e.g., General Electric Co. v. United States,* 572 F.2d 745, 755, 198 USPQ 65, 93, 215 Ct.Cl. 636 (1978); *In re Harwood,* 390 F.2d 985, 989, 156 USPQ 673, 676, 55 CCPA 922 (1968); *CPC International, Inc. v. Standard Brands, Inc.,* 385 F.Supp. 1057, 1061, 184 USPQ 332, 335 (D.Del.1974); *Novelart Mfg. Co. v. Carlin Container Corp.,* 363 F.Supp. 58, 76, 179 USPQ 17, 29 (D.N.J.1973). Whether the appropriate basis for holding claim 1 invalid be failure of compliance with the utility requirement of § 101 or with the enablement requirement of § 112, therefore, that holding must be affirmed.

In the present case, the district court interpreted claims 1, 3 and 4 as requiring

that the inventions set forth in those claims include a means for continuing convection during autoignition. The district court found, however, that convection did not in fact occur during occasional autoignition in the Roper oven, a finding which is not clearly erroneous. Given that claim interpretation and finding, the district court was compelled under the above authorities to hold those claims invalid. However, though the district court was correct in interpreting and holding invalid claim 1, it legally erred in interpreting claims 3 and 4.

■ Claim 1 specifically provides: "the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is thermally convected from the blower inlet through the air passages into the waveguide and *into the cavity for exiting through the cavity air vent notwithstanding the autoignition pressure* which exists in the cavity under high temperature self-cleaning conditions" (emphasis added). Though, as discussed *infra,* the phrase is based on Torrey's erroneous theory respecting the absence of waveguide fouling, and though the functional language is introduced by "so that", we must read the phrase as the equivalent of one specifying as an element in the claim "means for continuing convection during autoignition". Because the required continuation of convection (described by the parties as "prevention of backflow") during periods of autoignition does not and physically cannot happen, claim 1 must be held invalid. *Graver Mfg. Co., supra.*

■ The district court impermissibly read the above-quoted language from claim 1 into claims 3 and 4. The impropriety of reading limitations into claims is dramatized where, as here, the limitation sought to be added is already present in another claim. *Environmental Designs, Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 699, 218 USPQ 865, 870–71 (Fed.Cir.1983). *Accord, Fromson v. Advance Offset Plate, Inc., supra,* at 1570; *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1116, 219 USPQ 185, 188 (Fed.Cir.1983); *Kalman v. Kimberly Clark Corp.,* 713 F.2d 760, 770, 218 USPQ 781, 788 (Fed.Cir.1983).

In arguing that claims must be read·in light of the specification, that prevention of backflow is the "essence" of Torrey's invention, and that *all* claims must therefore be read as including the quoted limitation of claim 1, Raytheon confuses the respective roles of the specification and claims. That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims. On the contrary, as was said in *Environmental Designs, supra,* 713 F.2d at 699, 218 USPQ at 871:

> [t]he specification must be sufficiently explicit and complete to enable one skilled in the art to practice the invention, while a claim defines only that which the patentee regards as his invention. 35 U.S.C. § 112. The claim, not the specification, measures the invention. (Case cited). [T]he argument that claim 1 must include a limitation found in the specification is thus legally unsound. *Smith v. Snow,* 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935).

Raytheon says Roper is precluded by an "appeal estoppel" from contesting the inclusion of "no backflow during autoignition" in all claims because Roper relied on "no backflow" in the district court and should not be allowed to change its theory on appeal. Examination of the trial record, however, reveals that Roper there stressed the theory it urges on appeal, and that it was *Raytheon* which argued that the "essence" of Roper's invention was no backflow during autoignition.

In its opening statement at trial, Roper stressed "no fouling" and various other objectives without once mentioning "no backflow" (let alone "no backflow during autoignition"). In Roper's forty-page Proposed Findings of Fact and Conclusions of Law, Roper mentioned *only once* (proposed finding 79) that there is no backflow during autoignition. In its pretrial brief, Roper stated that it:

discovered that by positioning the microwave feed system below the oven cavity, and providing an air path from an air inlet below the cavity through the microwave feed system (including the waveguide) and up into the cavity, natural convection would draw air through that path to the oven cavity and up through it to result in sufficient venting of the oven during both thermal cooking and self-cleaning. *For reasons not really understood,* the waveguide through which convected air flowed would not be fouled by normal autoignition pressures that occur during self-cleaning, even though the waveguide entry location at the bottom of the oven cavity would seem to be a place subject to particularly high contamination. [Emphasis added]

That is not the approach of one hinging its entire case and all the claims on "no backflow during autoignition". The unchallenged evidence established that Roper's ovens experienced no fouling or contamination. There is no basis in the record, therefore, for the imposition of an "appeal estoppel" precluding Roper from reliance on the claims as written and allowed.

2. *The district court erroneously interpreted claims 1, 2 and 5–7 as requiring the prevention of autoignition.*

The district court, at Raytheon's urging, interpreted claims 1, 2 and 5–7 as requiring the prevention of autoignition. Because autoignition clearly occurs, that interpretation apparently led to the holding that those claims were invalid for lack of utility. That interpretation, however, was legally erroneous, and Raytheon has virtually abandoned it in its briefs on appeal.

The district court apparently and incorrectly equated prevention of "autoignition" with prevention of "explosive reactions", the latter being required by claims 1, 2 and 5–7. As the district court found, autoignition occurs when the decomposition products of pyrolytic self-cleaning react with some excess air to produce combustion. It is only when greater amounts of air enter the cavity that autoignition might escalate into an "explosion". Torrey did not claim

to prevent autoignition; he claimed only to prevent explosions by restricting the air path to limit the excess of air to a level below that productive of explosions. As stated by Roper in its Proposed Findings of Fact and Conclusions of Law, "it is well known in the art that one cannot completely eliminate the possibility of autoignition", and "too much air in the oven during self-cleaning causes the autoignition to become severe and even explosive". The patent itself addresses autoignition as something to be "resisted", not eliminated. Moreover, the difference in the two concepts is illustrated by claim 1's express acceptance of "autoignition pressure" and prevention of an "explosive reaction".

Thus, although claim 1 was correctly held invalid as set forth in section 1 above, there is no basis in the record on which to hold claims 2–7 invalid for lack of utility.

3. *A claimed invention need not accomplish all objectives stated in the specification.*

The district court held the '520 patent invalid in part because Roper's oven, as set forth in claims interpreted by the district court as requiring prevention of backflow and autoignition, failed to accomplish all objectives stated in the patent. Raytheon urged at oral argument that that holding is compelled by *Mitchell v. Tilghman,* 86 U.S. (19 Wall.) 287, 396–97, 22 L.Ed. 125 (1873) (a patent is void "if the described result cannot be obtained by the described means"). In *Mitchell,* the described result was production of fatty acids and glycerin from fatty or oily substances by the action of water at high temperature and pressure. *Id.* at 296, 380, 22 L.Ed. 125. That was the single result stated and was an element of the *claim. Id.* at 296, 22 L.Ed. 125. To interpret *Mitchell* as requiring that all claims must set forth inventions satisfying all objectives would make no sense. When a properly claimed invention meets at least one stated objective, utility under § 101 is clearly shown. *See e.g., Standard Oil Co. (Indiana) v. Montedison, S.P.A.,* 664 F.2d 356, 375, 212 USPQ 327,

344 (3rd Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1258 n. 10, 1260 n. 17, 205 USPQ 1, 8 n. 10, 10 n. 17 (8th Cir.1980); *Krantz and Croix v. Olin,* 148 USPQ 659, 661–62 (CCPA 1966); Chisum on Patents, ¶ 4.04[4] [1983].

Here, the Torrey invention as set forth in claims 2–7 clearly accomplished at least one, and a major one, of the patent's stated objectives, *i.e.,* a "ventilating system for a common cavity oven usable in all three modes of operation and which is safe in all three modes and which runs no risk of violent explosion of the products of combustion in the self-clean mode". The incorrectness of Torrey's theory explaining the absence of fouling (i.e., that continued convection prevented backflow during autoignition) does not undermine the unchallenged accomplishment of the quoted objective by the ovens set forth in claims 2–7. Torrey was attempting to explain in his specification why his tests showed no fouling, and a patentee is not responsible for the correctness of such theories and explanations when their correctness is not related to validity of the claims under consideration. *See e.g., Fromson v. Advance Plate, Inc., supra,* at 1570. (In *Fromson,* the sole issue was infringement, and validity of non-asserted claims including a limitation based on the patentee's theory that an alumino-silicate layer was produced, was not before the court.)

4. *Lack of utility cannot co-exist with infringement and commercial success.*

The wisdom of the trial court in deciding validity and infringement, and the interrelationship of those issues, are manifested in the present case. *See, Medtronic, Inc. v. Cardiac Pacemakers,* 721 F.2d 1563 at 1582 (Fed.Cir.1983); *Gore v. Garlock, supra,* at 1559.

The district court's finding on infringement of claim 1 was clearly erroneous because Raytheon's proof established the impossibility of its oven having a means to continue convection during autoignition.

However, the court's finding on infringement of claims 2–7 was not clearly erroneous. *See* section E, *infra.* That finding compels the conclusion that claims 2–7 cannot be held invalid for lack of utility.

■ A correct finding of infringement of otherwise valid claims mandates as a matter of law a finding of utility under § 101. *See e.g., E.I. du Pont de Nemours & Co. v. Berkley & Co., supra,* 620 F.2d at 1258–61, 205 USPQ at 8–11; *Tapco Products Co. v. Van Mark Products Corp.,* 446 F.2d 420, 428, 170 USPQ 550, 555–56 (6th Cir.), *cert. denied,* 404 U.S. 986, 92 S.Ct. 2151, 30 L.Ed.2d 370 (1971). The rule is not related, as Raytheon argues, to whether a defendant may simultaneously assert non-utility and non-infringement; a defendant may do so. The rule relates to the time of decision not to the time of trial, and is but a common sense approach to the law. If a party has made, sold, or used a properly claimed device, and has thus infringed, proof of that device's utility is thereby established. People rarely, if ever, appropriate useless inventions.

Proof of such utility is further supported when, as here, the inventions set forth in claims 2–7 have on their merits been met with commercial success. *See e.g., Medtronic, Inc., supra,* at 1582; *Wilden Pump v. Pressed & Welded Products Co., supra,* 655 F.2d at 988, 213 USPQ at 285; *CTS Corp. v. Piher International Corp.,* 527 F.2d 95, 105, 188 USPQ 419, 428 (7th Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976).

In sum, we hold in this section B that claims 2–7 are not invalid for lack of utility.

C. *Invalidity Under 35 U.S.C. § 112*

■ After stating that Raytheon's challenge under § 112 was largely a restatement of its challenge under § 101, the district court held that Raytheon had sustained its burden of proving invalidity under the former. We agree that the two defenses rest on the same foundation in this case. Having reversed the holding of invalidity of claims 2–7 under § 101, we accordingly reverse the holding with respect to

those claims under § 112. We conclude as a matter of law that the specification of the '520 patent contains a clear description enabling one skilled in the art to make and use the inventions set forth in claims 2–7.[6]

### D. *35 U.S.C. § 103*

The district court properly approached and decided the nonobviousness/obviousness issue in light of 35 U.S.C. § 103. First, it recognized the statutory presumption of validity and that the burden was on Raytheon to overcome it by proving facts with clear and convincing evidence. *See e.g., Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 at 1549 (Fed.Cir.1983).[7] Second, the court neither ignored nor modified the presumption merely because Raytheon cited prior art not before the Patent Office. Citation of such art—even when more pertinent than the art before the Examiner (which the district court correctly found was not the case here)—does not destroy the presumption, although it may make it easier for the one attacking validity to overcome the burden set by 35 U.S.C. § 282. *See Connell, supra,* at 1549. Third, the district court correctly assessed the evidence in light of the factual inquiries enunciated in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Presumably, the district court's conclusion of nonobviousness (and finding of infringement, discussed *infra*) applied to all claims, although the opinion did not so state (the "patent" was declared invalid; the "claims" were found infringed). For purposes of this appeal, "the claimed invention" in what follows concerning nonobviousness and infringement may be read as in light of representative claim 5. Because the claims were not argued separately on

appeal, and because differences in the claims cannot here affect the result, all claims (except claim 1) can be seen to stand or fall with claim 5. *See e.g. In re Kaslow,* 707 F.2d 1366, 1376, 217 USPQ 1089, 1096 (Fed.Cir.1983).

#### 1. *The Prior Art*

The relevant prior art encompassed microwave ovens, combination microwave-thermal ovens, and self-cleaning thermal ovens. A summary of relevant prior art teachings is contained in the "Background" section, *supra.* Additionally, although the prior art taught placement of a microwave feed unit below a microwave oven, it taught away from placing an open feed unit below a self-cleaning common cavity oven because the art believed the unit would be contaminated.

#### 2. *Differences Between the Prior Art and the Claimed Invention*

The claimed invention is a self-cleaning common cavity oven having, *inter alia,* (1) an open waveguide located at the bottom, (2) through which forced, cooling air from the blower passes during the microwave mode only, and (3) ventilation occurs via convection through the waveguide openings during the thermal and self-cleaning modes. No self-cleaning common cavity oven existing at the time of the Torrey invention embodied any of those three elements.

#### 3. *Level of Ordinary Skill in the Art*

Raytheon and Roper employed people skilled in the art of designing ovens for cooking food in both microwave and thermal modes, among them graduate engineers with substantial background and experience

---

**6.** Enablement under 35 U.S.C. § 112, paragraph 1, is a question of law. *In re Hogan,* 559 F.2d 595, 604, 194 USPQ 527, 535 (Cust. & Pat.App.1977); *In re Brandstadter,* 484 F.2d 1395, 1405, 179 USPQ 286, 293 (Cust. & Pat. App.1973); *In re Naquin,* 398 F.2d 863, 866, 158 USPQ 317, 319, 55 CCPA 1428 (1968); *In re Chilowsky,* 306 F.2d 908, 909, 134 USPQ 515, 516, 55 CCPA 806 (1962). *Accord, Plastic Containers Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885, 891–92 n. 9, 203 USPQ 27, 32 n. 9 (10th Cir.1979), *cert. denied,*

444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Hirschfeld v. Banner,* 462 F.Supp. 135, 142, 200 USPQ 276, 281 (D.D.C.1978), *aff'd,* 615 F.2d 1368 (D.C.Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 193 (1981).

**7.** That presumption, stated in 35 U.S.C. § 282, also applies to utility. *See e.g., Medtronics, Inc. v. Cardiac Pacemakers, Inc., supra,* at 1567.

in the design, development, and marketing of ovens.

#### 4. *Objective Evidence of Nonobviousness*

Evidence of long felt need, unexpected results and commercial success is outlined in the "Background" section, *supra.*

#### 5. *Conclusion on Nonobviousness*

The district court concluded that Raytheon did not overcome the presumption of nonobviousness, and we agree. Raytheon has not shown these findings to have been clearly erroneous: the findings under 1–3 above; the finding that persons of ordinary skill were unable to devise a common cavity oven with proper ventilation and a pyrolytic self-cleaning feature; or the finding that Torrey unexpectedly found that his invention worked. Those fact findings, together with those on commercial success and the prior art's teaching away from location of the open waveguide at the bottom of a self-cleaning common cavity oven, are highly probative, objective criteria fully capable of serving as a foundation for the legal conclusion of nonobviousness.

Raytheon suggests that Roper merely combined well known elements to form its oven. In the district court, Raytheon was more explicit, citing a single sentence from the opinion in *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950) ("courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements"). This court has been unable to construe the cited sentence, however, "as a rule of law applicable broadly to patent cases because virtually every claimed invention is a combination of old elements", *Medtronic, Inc. v. Cardiac Pacemakers, Inc., supra,* at 1566, and because the Supreme Court has held combinations of old elements patentable. *See, e.g., United States v. Adams,* 383 U.S. 39, 51–52, 86 S.Ct. 708, 714–715, 15 L.Ed.2d 572 (1966). It is moreover simplistically unrealistic to employ a separate test of

patentability for combinations of old elements when the language of the 1952 Patent Act provides no basis for either classifying patents into different "types" or for applying different treatment to different "types" of patents. *Accord, Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1579–80, 219 USPQ 8, 12 (Fed.Cir.1983); *Environmental Designs, Ltd. v. Union Oil Co. of Cal., supra,* 713 F.2d at 698, 218 USPQ at 870.

### E. *Infringement*

Whether an accused device infringes properly interpreted claims is a fact question. *See e.g., Fromson v. Advance Offset Plate, Inc., supra,* at 1569. Here, the district court apparently found infringement under the doctrine of equivalents. The test for equivalency is whether the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the claimed invention. *Hughes Aircraft v. United States,* 717 F.2d 1351, 1361, 219 USPQ 473, 480 (Fed.Cir.1983). The finding on equivalency is subject to the clearly erroneous standard on review. *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572 at 1578–79 (Fed.Cir.1983). Here, the district court's ultimate finding of equivalence (except in respect of claim 1) has not been shown to have been clearly erroneous.

Raytheon asserts three differences between its oven and the claimed invention. First, the former has a gap in its door, and the claim includes "a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy". Raytheon's gap precludes a finding of literal infringement but not a finding of infringement under the doctrine of equivalents. The district court found that Raytheon's gap does not materially affect entry of air, most of which comes through the waveguide, only the most minor amounts being admitted through the gap. The district court said, "[t]he functioning of the air flow system taught in the Torrey claims is embraced by the Raytheon oven". That finding has not been shown to have been clearly erroneous.

Second, Raytheon says its oven does not prevent backflow and autoignition, and all claims should be interpreted as requiring prevention of both. As above indicated, however, only claim 1 contains a "no back-flow" limitation, and no claim contains a "no autoignition" limitation. Hence, only the court's finding that claim 1 is infringed is clearly erroneous.

Third, Raytheon argues that convection air does not enter its waveguide through its blower inlet, as required by claims 2 and 4–7, nor through the blower inlet and housing vent as called for in claim 3, but through a hole in the duct attached to its waveguide. Raytheon's convection air from its attached duct, however, "performs substantially the same function in substantially the same way to obtain the same result" as convection air from the blower inlet, and the district court's finding of equivalence in convection air inlet locations has not been shown to have been clearly erroneous.

### Attorney Fees

■■■■■ Under 35 U.S.C. § 285, a district court may award such fees to the prevailing party in "exceptional" cases. The decision to award or deny fees is discretionary with the district court. *See e.g., Orthopedic Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1384, 217 USPQ 1281, 1287 (Fed.Cir.1983). No basis has been shown for a determination that the district court abused its discretion in denying attorney fees to Raytheon.

### CONCLUSION

The district court did not err in holding claim 1 invalid, in holding that the inventions set forth in claims 2–7 would have been nonobvious, in finding claims 2–7 infringed, or in denying Raytheon's request for attorney fees. The district court did err in holding claims 2–7 invalid under 35 U.S.C. § 101 for lack of utility and under 35 U.S.C. § 112 for lack of an enabling disclosure.

Accordingly, we affirm the judgment that claim 1 is invalid, affirm the judgment that claims 2–7 are not invalid under 35 U.S.C. § 103, affirm the judgment that claims 2–7 are infringed by the accused Raytheon ovens, affirm the denial of attorney fees to Raytheon, reverse the district court's judgment that claims 2–7 are invalid, and remand for further proceedings consistent herewith.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.

### APPENDIX—CLAIMS OF ROPER PATENT

1. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, control means for operation of the thermal element at a normal temperature level for food preparation and at a high level for a self-cleaning mode, the walls of the cavity being insulated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply including a blower and a magnetron having cooling fins, the blower having a blower inlet for drawing in cooling air and an outlet for supplying such air under slight pressure to the cooling fins, a waveguide having an inlet connected to the magnetron and extending under the bottom wall of the cavity to terminate at an outlet, means for connecting the outlet of the waveguide to the inlet opening of the cavity for conduction of microwave energy into the cavity, means defining air passages of limited cross section for conducting air from the magnetron into the waveguide so that a portion of the pressurized air passes through the waveguide and into the cavity for ventilating the cavity when the magnetron and blower are turned on, the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is thermally convected from the blower inlet through the air passages into the waveguide and into the cavity for exiting

through the cavity air vent notwithstanding the auto ignition pressure which exists in the cavity under high temperature self-cleaning conditions, the convection path of the air being sufficiently constricted so that air is convected in the self-cleaning mode at a level below that which is capable of producing an explosive reaction with the products of decomposition.

2. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, control means for operation of the thermal element within a normal temperature range for food preparation and at a high temperature level for a self-cleaning mode, the walls of the cavity being insulated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply having a housing including a magnetron and blower, the blower having a blower inlet and arranged to draw in cooling air for supplying under slight pressure to the magnetron with discharge of at least a portion of the air into the housing to create slight pressure therein, a waveguide having an inlet connected to the magnetron and extending under the bottom wall of the cavity to terminate at an outlet, means for connecting the outlet of the waveguide to the inlet opening of the cavity for conduction of microwave energy into the cavity, means defining a pattern of small air passages from the housing to the waveguide so at least a portion of the pressurized air from the housing passes through the air passage and waveguide and into the cavity for ventilating the cavity when the magnetron and blower are turned on, all portions of the waveguide and housing including the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is thermally convected from the blower inlet through the small air passages and waveguide into the cavity for exiting through

the cavity air vent, the convection path of the air being sufficiently constricted so that air is convected in the self-cleaning mode at a level below that which is capable of producing an explosive reaction with the products of thermal decomposition.

3. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, the walls of the cavity being insulated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply having a housing including a magnetron and blower, the blower having a blower inlet and arranged to draw in cooling air from outside the housing for supplying under slight pressure to the magnetron, the cooling air being discharged from the magnetron into the housing for creating internal pressure therein, a waveguide coupled to the magnetron and extending along the housing and under the bottom wall of the cavity, the waveguide having an outlet alined with the opening in the bottom wall of the cavity, a hollow open-ended conductor extending through the opening for coupling the outlet of the waveguide to the cavity, means for securing the upper end of the hollow conductor to the bottom wall of the cavity and the lower end of the conductor to the waveguide for conduction of microwave energy into the cavity, the wall of the waveguide having a pattern of small openings communicating with the housing so that a portion of the pressurized air from the blower and magnetron passes through the waveguide and hollow conductor into the cavity for ventilating the cavity when the magnetron and blower are turned on, the housing having a relatively large vent opening through which the pressurized air therefrom passes outwardly to reduce the internal pressure in the housing thereby to reduce the flow of air through the pattern of small openings and into the cavity to a predetermined low level, the blower inlet

and large vent opening being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on flow of air through the large vent opening is reversed in direction flowing inwardly through such vent opening into the housing and through the small openings via the waveguide into the cavity with final exiting through the cavity air vent.

4. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, the walls of the cavity being insulated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply having a housing including a magnetron and blower, the blower having a blower inlet and arranged to draw in cooling air for supplying under slight pressure to the magnetron, a waveguide coupled to the magnetron and extending under the bottom wall of the cavity, the waveguide having an outlet alined with the opening in the bottom wall of the cavity, a hollow open-ended conductor extending through the opening for coupling the outlet of the waveguide to the cavity, means for securing the upper end of the hollow conductor to the bottom wall of the cavity and the lower end of the conductor to the waveguide for conduction of microwave energy into the cavity, an antenna element centered in the hollow conductor and projecting into the cavity for guiding microwave energy to the latter, means for conducting at least a portion of the pressurized air from the blower and magnetron through the waveguide and hollow conductor into the cavity for ventilating the cavity when the magnetron and blower are turned on, the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is convected through the blower inlet, waveguide and hollow conductor into the cavity for exiting through the cavity air vent at the top thereof.

5. In a combined microwave-thermal range, the combination comprising a frame having walls defining a rectangular oven cavity and a lower space of conforming shape, a door enclosing and sealing the front surface of the cavity against passage of air and microwave energy, a thermal element in the cavity, control means for operation of the thermal element within a normal temperature range for food preparation and at a high temperature level for a self-cleaning mode, the walls of the cavity being insulated, the bottom wall of the cavity having an inlet opening, means defining a cavity air vent at the top of the cavity, a microwave power supply having a housing including a magnetron and blower, the blower having a blower inlet and arranged to draw in cooling air for discharge under slight pressure to the magnetron, a waveguide having an inlet connected to the magnetron and extending under the bottom wall of the cavity to terminate at an outlet, means for connecting the outlet of the waveguide to the inlet opening of the cavity for conduction of microwave energy into the cavity, the waveguide being open to passage of cooling air from the magnetron so at least a portion of the pressurized air from the blower and magnetron passes through the waveguide and into the cavity for ventilating the cavity when the magnetron and blower are turned on, the blower inlet being located at a level below the bottom wall of the cavity so that when the blower and magnetron are turned off and the thermal element is turned on air is thermally convected through the blower inlet, magnetron, and waveguide into the cavity for final exit through the cavity air vent at the top thereof, the air passage through the blower, magnetron and waveguide being sufficiently constricted so that the air is convected in the self-cleaning mode at a level below that which is capable of producing an explosive reaction with the products of thermal decomposition.

6. The combination as claimed in claim 5 in which the constriction in the air passage through the blower inlet, magnetron and waveguide is in the form of a pattern of small openings in the wall of the waveguide and in communication with the housing, the openings being of sufficiently small dimension so as to preclude the escape of microwave energy therethrough.

7. The combination as claimed in claim 6 in which the openings in the wall of the waveguide and the vent opening are sufficiently limited in total area as to limit the flow of air for microwave cookery to within the range of three to eight c.f.m. when the blower is on and to reduce the flow of convected air under baking and self-cleaning conditions to within the range of 0.5 to 2 c.f.m.